Clifford Yewdall v. Commissioner. Clifford Yewdall and Grace Yewdall v. Commissioner.
Yewdall v. Commissioner
Docket Nos. 40031, 40032.
United States Tax Court
1954 Tax Ct. Memo LEXIS 263; 13 T.C.M. (CCH) 248; T.C.M. (RIA) 54087; March 26, 1954
*263 C. F. Rothenburg, Esq., and James P. Jones, Esq., for the petitioners. S. Jarvin Levison, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of $3,610.52, $1,753.44, and $3,636.78 for the years 1946, 1947, and 1948. The petitioners allege that the Commissioner erred: (1) In allowing $8,874.85 due from Vic Verity Publications, Inc., as a non-business bad debt for 1946, instead of allowing it in full as a business bad debt, and in failing to allow an additional bad debt deduction not claimed on the return of $3,000 for other bad debts due from the same debtor; (2) In failing to allow a deduction of $131 for 1946 on account of the investment in stock of Vic Verity Publications, Inc. becoming worthless in that year; (3) In allowing $5,096.97 due from Vic Verity Publications, Inc., as a non-business bad debt for 1947, instead of allowing it in full as a business bad debt, and in failing to allow an additional bad debt deduction not claimed on the return of $1,028.18 due from the same debtor; (4) In failing to allow a bad debt deduction of $12,700 for 1948 on account of loans made to *264 National Sportsman, Inc.; (5) In failing to allow bad debt deductions of $23,150 for 1948 on account of loans to Y-K Management Corporation; (6) In failing to allow a deduction of at least $1,000 for 1948, representing the cost of stock of Y-K Management Corporation which became worthless in that year; and (7) In adding $400 to the petitioner's income for 1948 as the fair market value of stock received as compensation from National Sportsman, Inc. Findings of Fact The returns for the taxable years were filed with the collector of internal revenue for the Third District of New York. Clifford (hereafter called the petitioner) was born in 1886. The only business in which he was regularly engaged for a number of years prior to 1945 was his practice as a certified public accountant. He continued to engage in that business during the taxable years, although he then devoted only a part of his time to it. The petitioner, after entering into a contract on May 1, 1945, pertaining to his accounting business, as a result of which he limited the amount of time which he devoted to his accounting profession, decided to finance, promote, loan money to and borrow money for various corporations, *265 using his credit which he had established with a bank or banks in New England. The petitioner, in 1945, formed a corporation known as Northwest Broadcasters and he borrowed $60,000 from a bank which he planned to have the corporation use to buy a radio station in Tacoma, Washington. The seller at the last moment refused to sign the contract and the deal was not made. Allen Kander, a broker of publishing properties, came to the petitioner in 1945 seeking money for Allen Norman, then secretary of a publishing company, who wanted to publish a comic book under the title of Vic Verity. The petitioner formed a corporation in August 1945 under the name of Vic Verity Publications, Inc. (hereafter called Verity) for the purpose of publishing the comic book. The petitioner became treasurer of the corporation. Kander acquired 262 shares in the corporation, the petitioner acquired 132 shares and his wife acquired 131 shares, Norman acquired 375 shares, and another person acquired 100 shares, each person paying $1 per share for the stock. The stock became worthless in 1946. Verity, on September 13, 1945, executed a note in the amount of $10,000 payable to the petitioner, and on March 14, 1946 executed *266 another similar note in the amount of $5,000 payable to the petitioner. The petitioner in each case endorsed the note and sent it to the Second National Bank of Nashua, New Hampshire, which deposited the proceeds to the account of Verity. Verity was insolvent on August 31, 1946 and ceased operations. The petitioner, pursuant to his liability as endorser of the notes of Verity, paid the Second National Bank of Nashau $8,874.85 during 1946 and in 1947 made another similar payment of $5,096.97. He executed a demand note to the bank on June 15, 1947, in the amount of $3,605.18 of which $1,028.18 represented his liability on the Verity note. He paid $1,801.81 in 1947 on the note for $3,605.18, and on September 29, 1947 incorporated the balance due on that note in a new note for $21,806.70, which he gave to the bank and thereafter in 1947 made payments of $781.50 on that note followed by payments of $6,313.30 in 1948. The Commissioner, in determining the deficiencies for 1946 and 1947, disallowed bad debt deductions of $8,970.85 and $5,096.97 claimed on the returns with the explanation that the debts in those amounts due from Verity which became worthless in those years were non-business *267 bad debts to be treated as short-term capital losses. The petitioner did not claim any deduction for the balance of $1,028.18 on his return for either of those years. The petitioner loaned Verity $1,500 on July 2, 1946 and $1,500 on July 30, 1946. Those debts were worthless in 1946 but no deduction was claimed on the petitioner's return for 1946 on account of them. The debts of $8,874.85, $3,000 and $5,096.97 were business debts. The petitioner organized another corporation known as Don Fortune Publishing Company, Inc., on March 9, 1946, to publish another comic book. He became involved for about $10,000 in that venture in some way not shown by the record. That corporation had not been liquidated at the time of the trial of this case. Kander told the petitioner at some time prior to September 23, 1946, that he thought the stock of National Sportsman Incorporated, a Maine corporation which was then publishing a magazine called "Hunting and Fishing", could be bought. The petitioner, after negotiations, entered into an agreement on October 10, 1946, to purchase 8,404 out of 8,414 of the outstanding shares of common stock of National Sportsman Incorporated. National Sportsman, *268 Inc. (hereafter called Sportsman) was incorporated in Delaware on September 23, 1946 to acquire the stock of the Maine corporation. The petitioner exchanged his agreement to purchase dated October 10, 1946, for 15,100 shares of the stock of Sportsman. 4,080 additional shares of Sportsman were sold to others at $1 per share, 1,000 of which were acquired by Y-K Management Corporation (hereafter called Y-K). 400 additional shares of Sportsman were issued to the petitioner in 1948. Y-K was incorporated on September 24, 1946, and the petitioner transferred to it the 15,100 shares of Sportsman which had just been issued to him. The petitioner and his wife acquired 1,000 shares and Kander and members of his family acquired the remaining 1,000 shares of Y-K, paying $1 for each share. Y-K became the manager of Sportsman and received income from that source until the bank substituted its manager. Sportsman, on October 1, 1946, issued $267,400 of its Series A notes due October 1, 1952, to the former stockholders of the Maine corporation as part of the purchase price of their stock. Those notes were subordinate to a loan of $300,000 which Sportsman obtained on its note on October 10, 1946, from *269 The First National Bank of Boston. It pledged the stock of the Maine corporation as collateral for the loan. The petitioner and Kander guaranteed the loan and pledged for that purpose stock of Sportsman held by Y-K. The bank, in making the loan, relied in part upon the credit of the petitioner. Sportsman was required to pay $7,500 monthly on the note and when it was unable to continue those payments the bank in June 1948 tried unsuccessfully to sell Sportsman to its competitors, and in July 1948 put in its own manager to operate Sportsman. Sportsman issued its Series B notes to various stockholders other than the petitioner in the total amount of $100,500 in the period from September 30, 1946 through January 31, 1948. The petitioner loaned Sportsman $12,700 in January 1948 and received its Series B notes to evidence the loan. Those notes were subordinate to all other indebtedness of the corporation. Sportsman thereafter issued to the petitioner its Series B notes, one for $9,600 on September 30, 1948, another for that amount on November 30, 1948, and one for $3,500 on September 30, 1949. Sportsman paid him $9,600 on Series B notes on January 31, 1949. The petitioner loaned Y-K *270 $20,000 on September 29, 1947 and received its note for that amount secured by $25,000 Series B notes of Sportsman and 1,000 shares of Sportsman stock. Y-K loaned $19,500 of that money to Sportsman on September 29, 1947. The petitioner obtained the $20,000 from the Second National Bank of Nashua on his note for $21,806.70 dated September 29, 1947, mentioned above. Y-K paid the petitioner $1,500 in 1947 and $1,500 in 1948 on its note for $20,000. Sportsman was publishing the magazine at the end of 1948 and publication of the magazine continued through 1949 and until some time in 1950. Sportsman had operating losses of $4,174.91 for 1946, $143,114.74 for 1947, and $71,906.85 for 1948. Its balance sheet at the end of 1948 was as follows: ASSETS
Cash
$ 39,030.66
Accounts receivable
45,819.50
Inventories
21,758.02
Fixed assets at appraised value
54,600.20
Other assets
1,824.50
Circulation structure and good
will
577,702.59
Total
$740,735.47
LIABILITIES
Accounts payable
$118,157.80
Trade acceptances payable
5,572.76
Bank loans payable
141,316.90
Reserve for tax and interest
17,305.38
Bank loan due subsequent to
12/31/49
60,000.00
Series A notes due 9/30/51
$265,766.76
Series B notes due 9/30/52
131,900.00
Sundry reserve
24,894.14
Subscriptions paid in advance
388,490.15
Capital stock
20,980.00
Deficit
433,648.42
Total
$740,735.47
*271 The petitioner borrowed $5,000 with interest at 6 per cent from the Second National Bank of Nashua on March 1, 1948, and gave his demand note secured by Y-K's note for $20,000 dated September 29, 1947 and the collateral on that note. He then loaned the $5,000 at 5 per cent interest on the same day to Y-K and received its note for that amount. Y-K used the $5,000 to buy a magazine known as the "American Woman" and thereafter published that magazine until it became a failure some months later. The petitioner loaned Y-K $1,150 in April and July 1948. The petitioner deducted $9,210.34 on his 1948 return as if it was a worthless debt due from Verity whereas none of it related to Verity but $6,075.28 represented payments made in 1948 to the Second National Bank of Nashua on the petitioner's note dated September 29, 1947. $3,000 represented payments on notes to a bank in Davenport, Iowa, from which the petitioner had borrowed money, some of which he had loaned to Sportsman. The Commissioner, in determining the deficiency for 1948, added $400 to income as salary from Sportsman to represent the fair market value of the 400 shares of stock issued to the petitioner in that year and disallowed *272 the bad debt deduction of $9,210.34 with the explanation that the amount representing advances to Sportsman was not allowable as a business bad debt, a non-business bad debt, or a loss on capital investment. The following table shows the sources of the petitioner's gross income for the taxable years: 1946
1947
1948
Salaries
Matrix Contrast Corp.
$ 9,461.90
$ 9,765.94
$12,440.08
St. Regis Paper Co.
1,200.00
Y-K
2,500.00
Sportsman
8,750.00
Miscellaneous
150.00
175.00
Total Salaries
13,161.90
9,915.94
21,365.08
Dividends
1,137.50
1,310.00
1,709.98
Income from personal accounting
practice
Gross
12,885.42
7,526.76
14,008.99
Expenses
13,621.04
6,332.32
7,666.23
Net
(735.62)
1,194.44
6,342.76
Income from Kuhns, Yewdall &
Layman
9,443.18
6,795.96
6,755.40
Interest
4,800.00
Capital Loss
(268.86)
$22,738.10
$19,216.34
$40.973.22
Matrix was a successful corporation in which the petitioner had been interested for many years. He endorsed some notes for it during the taxable years and was not required to make any payments as a result. Neither that corporation nor any other in which he had been interested prior *273 to 1945 had any connection with any business regularly carried on by the petitioner during the taxable years. The petitioner was an officer of Verity, Sportsman and Y-K and during the taxable years spent a substantial amount of his time borrowing money for, lending money to, and working for those corporations in an effort to conduct their affairs successfully. The petitioner did not maintain books of account to record his transactions for or with those corporations. The debts due from Sportsman did not become worthless in 1948. The debts due from Y-K did not become worthless in 1948. The stock of Y-K became worthless in 1948. The debts due from Verity were proximately related to the business of the petitioner in promoting, lending money to, borrowing money for, and operating corporations of which Verity was one. The stipulation of facts, including the exhibits made a part thereof, and all other facts agreed to by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: Y-K and Sportsman were indebted to the petitioner at the end of 1948 but the record as a whole does not justify a finding that that indebtedness became worthless in 1948. Sportsman, *274 while losing money and insolvent, was still operating at the close of that year and continued to operate for more than a year thereafter. The petitioner testified that the publications in 1949 and 1950 were merely an attempt on the part of the printer to salvage something out of the situation, but regardless of why the publication of the magazine and the operation of the corporation continued, the fact is that they did continue and the evidence does not show what was realized finally from the assets. Also, the petitioner received payment of a debt from Sportsman in 1949 and was given an additional Series B note by Sportsman in 1949 indicating a new loan. These facts, conceded by his counsel, are inconsistent with his contention that the Sportsman indebtedness was totally worthless at the end of 1948. The Y-K indebtedness depended principally upon the Sportsman situation. Sportsman owed money to Y-K. If that indebtedness was not entirely worthless at the end of 1948, then the indebtedness which Y-K owed the petitioner was likewise not entirely worthless at the end of 1948. The petitioner testified that Y-K was insolvent at the end of 1948, but the soundness of that opinion depended *275 upon whether the debts due it from Sportsman were worthless. Furthermore, insolvency does not prove worthlessness of debts. However, Y-K would have to pay over to the petitioner any recoveries it might make from Sportsman on that indebtedness and a fair conclusion to be drawn from the evidence is that the Y-K stock was worthless at the end of 1948. Likewise the Sportsman stock had no fair market value at the close of 1948. The Commissioner determined and still concedes that the debts due from Verity were worthless. The evidence shows that those debts for 1946 included $3,000 which the petitioner did not claim on his return for that year. The petitioner claims that there was an additional indebtedness of $1,028.18 due him from Verity at the end of 1947 because his liability to the Nashua bank on indebtedness of Verity in that amount had been incorporated by him in a new note to the bank and he made payments in 1947 on that note in excess of $1,028.18. However, the principle on which he is entitled to a bad debt deduction is that he has actually paid, as endorser, indebtedness of his debtor and as a result of that payment is entitled to sue his debtor for the amount of the payment. *276 Eckert v. Burnet, 283 U.S. 140; Shiman v. Commissioner, 60 Fed. (2d) 65. He has failed to show that he had any right to sue Verity in 1947 for the $1,028.18. He mixed it up with other indebtedness which he owed the bank and he only paid part of the combined obligation, the unpaid portion being in excess of the amount which he claims as a debt owed him by Verity. Cf. Eckert v. Burnet, supra. Such evidence does not constitute sufficient evidence of a debt due him from Verity at the close of 1947. The remaining and principal question in the case is whether the debts due from Verity arose in some business of the petitioner separate and apart from the business of the corporations in which he was interested as stockholder and officer. He devoted a substantial part of his time during the taxable years to the affairs of various corporations which he promoted, financed, and helped to operate. He received no salary or dividends from Verity and no income other than salary from any of the other corporations. He testified that after limiting his activity as an accountant, he decided to finance, promote, loan money to and borrow money for various corporations, using *277 his established credit, and he actually spent a substantial amount of his time borrowing money for, lending money to and working with several corporations in an effort to conduct their affairs successfully. The evidence is not overwhelming in his favor but justifies the conclusion that the debts due from Verity were business debts rather than non-business debts within the meaning of section 23 (k). Decisions will be entered under Rule 50.